## A11A0076. THOMAS v. THE STATE.
(710 SE2d 920)

SMITH, Presiding Judge.

Chiquita Monique Thomas appeals from her convictions for voluntary manslaughter and aggravated assault[1] and contends in her sole enumeration of error that insufficient evidence supports her voluntary manslaughter conviction.[2] For the reasons set forth below, we affirm.

Viewed in the light most favorable to the verdict, the record shows that Thomas and the victim had been dating for approximately eight months at the time of his death. The victim was 5'7" tall and weighed 381 pounds. The State introduced evidence of the following prior difficulties between Thomas and the victim: Thomas bit the victim on the chest three or four months before his death

---

[1] The jury acquitted Thomas of malice murder.

[2] Although Thomas asserts in her enumeration of error that insufficient evidence supports her aggravated assault conviction, she makes no argument and cites no authority with regard to her aggravated assault conviction. We will therefore treat this portion of her enumeration as abandoned. *Mathis v. State*, 299 Ga. App. 831, 839 (2) (c), n. 29 (684 SE2d 6) (2009) (unsupported enumeration of error abandoned under Court of Appeals Rule 25 (c) (2)).

leaving a scar that was visible after his death; Thomas hit and slapped the victim and threatened to kill him during the time they dated; Thomas stabbed the victim in the hand and chest with a fork during an argument while they were dating; and Thomas broke the windshield of the victim's car with a beer bottle during an argument. Witnesses presented by the State testified that they never saw the victim hit or threaten Thomas during these incidents. Thomas's mother and grandmother, on the other hand, testified that they witnessed the victim hitting, grabbing, and choking Thomas during previous arguments.

The medical examiner testified that the victim bled to death after being stabbed in the right side of the neck to a depth of four inches with a blow that penetrated his right lung and severed two major blood vessels on the way down. The victim also had a superficial defensive wound on the outside of his right upper arm midway between the shoulder and the elbow that came from a separate blow.

In her initial interview with police, Thomas claimed in a written statement that she stabbed the victim as a result of the following events:

> Chiquit went to the bathroom took a Bath put on my red bra & panty set and watched tv and [the victim] come and ask me why am I holding the cell phone he said oh some[one] must going to call you and then I put the celluar [sic] phone back in the other room and then got in the bed and [the victim] said give me my keys I said No because I want you to stay a little longer then later on I gave him his keys then he left and I locked the door and got back in the bed and laid down I heard his car pull up and I heard the door knob move and I ran and got a knife and stood by the stove and I said I thought you were going home so walk to the door he graped [sic] my arm and started pulling me out the door and then he graped [sic] the side of my neck and I was holding on to the side of back door and then he pulling me down the step and then I got a lose [sic] and ran in the front door and got the knife of [sic] the floor the he pushed me to the chair I swung the knife he said monique sabed [sic] me he got the knife and went to the bathroom and took of [sic] his shirt. I ran in the living room and waited until he went out the door I went out the back door look at his car and then the door and saw the keys and I put my jeans and purple sweat shirt on and when out the front door and ran to his [sic] he was on the ground I had another knife because I didn't know what he had done with the other one I throw the knife in the bushes and put my

sweat shirt on his neck when I sat him up. So I ran to my
aunt helen house and told her to call for help.

At trial, Thomas elaborated upon her written statement and ex-
plained that earlier in the evening, she took the victim's keys and
refused to give them to him because she was afraid to be alone and
did not want him to leave.

She claimed that during the subsequent altercation after the
victim returned, he accused her of cheating on him and told her, "I'm
going to stop this today." He also grabbed her by the neck and
"pushed me down by my . . . neck to the floor." She testified that he
was then "on my back holding me down" with his body and his right
arm was above her neck. She could not get him off and demonstrated
to the jury with a ruler how she went back with the knife and hit him
on the shoulder. She denied knowing that she stabbed him until he
told her that he had been stabbed, denied trying to stab him, denied
stabbing him more than once, and claimed that she was simply
trying to get him off her.

During closing argument, the district attorney argued, "And you
could see that the ruler was going no further, no matter how hard she
tried. It was going no further than here (demonstrating). There was
no way she could get her arm around and over and stab him in the
neck laying in that position. That . . . was a physical impossibility."

Photographs of Thomas's neck and back taken by the police
after the victim's death do not show any injuries, and the investi-
gating officer did not see any at the time he observed Thomas in jail.

On appeal, Thomas asserts that "[t]he evidence in this case did
not eliminate the reasonable hypothesis that the appellant was
acting in defense against the immensely larger attacker inside her
home." We disagree.

> A person commits voluntary manslaughter when he causes
> another person's death under circumstances which would
> otherwise be murder and acts solely as a result of a sudden,
> violent, and irresistible passion resulting from serious
> provocation sufficient to excite such passion in a reasonable
> person. OCGA § 16-5-2 (a). A person's intent and whether
> she acted in the heat of passion with adequate provocation
> or with justification depend largely on the credibility of
> witnesses. This was for the jury to assess. See *Brown v.
> State*, 225 Ga. App. 218, 219 (483 SE2d 633) (1997).

*Johnson v. State*, 236 Ga. App. 61, 63 (1) (510 SE2d 918) (1999),
disapproved on other grounds, *Schofield v. Holsey*, 281 Ga. 809,
811-812, n. 1 (642 SE2d 56) (2007). "A jury has unlimited discretion

to accept or reject a defendant's testimony as a whole, or to accept it in part and reject it in part. [Cit.]" *Johnson*, supra, 236 Ga. App. at 63 (1). As in *Johnson*, it was for the jury to determine how and why Thomas stabbed the victim and whether she did so in the heat of passion or with justification. Id. See also *O'Connor v. State*, 255 Ga. App. 893, 895 (1) (567 SE2d 29) (2002) (refusing "to reweigh evidence to place greater credence in [appellant's] justification defense than did jury").

*Judgment affirmed. Mikell and Dillard, JJ., concur.*

DECIDED JUNE 2, 2011.

*William J. Mason*, for appellant.

*Plez H. Hardin, District Attorney, Cecilia Cooper, Daniel P. Bibler, Assistant District Attorneys*, for appellee.